# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| WHITE OPERATING COMPANY | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-CV-0525-S |
| | § | |
| BANK OF AMERICA, N.A. | § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses the Motion of Defendant Bank of America, N.A., for Summary Judgment on Plaintiff's First Amended Complaint ("Motion") [ECF No. 112]. The Court has reviewed the Motion, Defendant's Brief in Support of the Motion ("Defendant's Brief") [ECF No. 113], Plaintiff White Operating Company's Response to the Motion ("Response") [ECF No. 118], Plaintiff's Brief in Support of the Response ("Plaintiff's Brief") [ECF No. 119], Defendant's Reply in Support of the Motion ("Reply") [ECF No. 123], Defendant's Notice of Supplemental Authority [ECF No. 133], the summary judgment evidence, and the applicable law. For the following reasons, the Court **GRANTS** the Motion.

## I. BACKGROUND

In this lawsuit, Plaintiff seeks payment from Defendant for "Oklahoma oil, condensate, liquids[,] and other hydrocarbons" sold approximately nine years ago. First Am. Compl. ("Amended Complaint") [ECF No. 77] ¶ 16. The purchaser of the products was non-party Murphy Energy Corporation, together with its parent company and affiliates (collectively, "Murphy"), a midstream provider of transportation, storage, and marketing services for oil and gas producers. *Id.*; App. of Exs. in Supp. of Def. Bank of America, N.A.'s Mot. for Summ. J. ("Defendant's Appendix") [ECF No. 114] Ex. A, at 3.

In 2012, Defendant provided Murphy with revolving[1] and term loan facilities under the Loan and Security Agreement ("Credit Agreement") dated September 12, 2012. Def.'s App., Ex. AA, at 522-637. The loan facilities included a $60 million revolver (or revolving loan) and a $6 million term loan, secured by liens on most of Murphy's assets. *Id.* at 567-68, 608; *see also* Def.'s App., Ex. A, at 3. Pursuant to the Credit Agreement, Murphy created a master deposit account with Defendant. Def.'s App., Ex. H, at 121 ¶ 5. Proceeds from resales of products that Murphy purchased from producers, like Plaintiff, were deposited in the master deposit account. *See id.* Defendant swept funds from the account daily. *Id.* The sweeps created additional borrowing capacity under the revolving loan, and Defendant would readvance funds to Murphy so that Murphy could pay its expenses. *Id.*

Plaintiff is an Oklahoma oil and gas company. Pl.'s Br. 5 ¶ 12. Plaintiff operates oil and gas properties and markets production in its wells for the benefit of holders of various interests. *Id.* In 2016, Murphy contracted to buy crude oil and gas ("Hydrocarbons") from Plaintiff. App. of Exs. in Supp. of Pl.'s Resp. to Def. Bank of America's Mot. for Summ. J. ("Plaintiff's Appendix") [ECF No. 120] Ex. A [ECF No. 120-1] 3 ¶ 6; *see also* Pl.'s App., Ex. E-2 [ECF No. 120-1] 314-16; Am. Compl. ¶ 16. Plaintiff sold Hydrocarbons to Murphy in June, July, and August 2016. Pl.'s App., Ex. D [ECF No. 120-1] 153 ¶¶ 2-3; *see also* Pl.'s App., Ex. E [ECF No. 120-1] 310 ¶ 6. Murphy never paid for these purchases and currently owes Plaintiff $2,586,956.86, plus interest. Pl.'s App., Ex. D, at 153-54 ¶ 3; *see also* Pl.'s App., Ex. E, at 310-11 ¶¶ 6, 8; Pl.'s App., Ex. E-10 [ECF No. 120-1] 431.

In July 2016, Defendant learned that Murphy was overadvanced. Def.'s App., Ex. H, at 122 ¶ 9; Pl.'s App., Ex. S [ECF No. 120-8] 4246. In other words, Murphy had borrowed more than the

---

[1] A revolving loan is one that the borrower can repay and then reborrow on a revolving basis, as set forth in the Credit Agreement. *See* Def.'s App., Ex. AA, at 548 § 2.1.1.

amount of loans available. Def.'s App., Ex. H, at 122 ¶ 9. Defendant "believes" this issue arose because Murphy used revolver advances to pay for capital expenditures and because Murphy entered into undisclosed netting agreements instead of collecting cash when it sold oil and gas.[2] *Id.* at 122 ¶ 11. Based on Murphy's overadvanced position and failure to comply with reporting obligations, Defendant declared a default under the Credit Agreement on July 22, 2016. *Id.* at 123 ¶ 12.

Also on July 22, Defendant asked Murphy to retain a chief restructuring officer. Pl.'s App., Ex. S, at 4245. Defendant suggested two advisory firms for Murphy to consider when selecting a chief restructuring officer: FTI Consulting and CR3 Partners. *Id.* at 4210-11 at 34:25-35:9; *see also id.* at 4245 (presenting FTI and CR3 as options "should [Murphy] wish to consider them"). Ultimately, Steven List, a partner at CR3, took over as Chief Restructuring Officer for Murphy. Def.'s App., Ex. V, at 429-30 ¶ 2.

After Defendant declared a default, Murphy was required to request advances under the revolver, and Defendant would decide whether to approve them. Pl.'s App., Ex. S, at 4218-19 at 42:11-43:7. At some point, Murphy represented to Defendant that it had found a buyer for Murphy's assets and debt. Def.'s App., Ex. H, at 123 ¶ 13. As a result, Defendant entered into the Forbearance Agreement and Thirteenth Amendment to Loan and Security Agreement with Murphy in September 2016. Def.'s App., Ex. L, at 171-84. The planned asset sale did not happen, and Murphy filed voluntary bankruptcy petitions in October 2016. Def.'s App., Ex. A, at 4.

---

[2] Under the netting agreements, Murphy offset its accounts receivable against its accounts payable when it sold oil and gas. Def.'s App., Ex. H, at 122 ¶ 11. As an example, in August 2016, Murphy resold less than 8% of its purchased oil and gas for cash. *See* Def.'s App., Ex. K, at 169 (showing approximately $26 million in the "Total Sold to Customer" column and only approximately $2 million in the "Cash Proceeds Collected" column).

Shortly after the bankruptcy case commenced, the United States Bankruptcy Court for the Northern District of Texas ("Bankruptcy Court") issued an order approving a post-petition financing facility (referred to in the parties' briefing as "DIP Order"), pursuant to which Defendant continued to finance Murphy. Def.'s App., Ex. G, at 48-118; *see also* Def.'s Br. 5 ¶ 20.

To resolve the issue of the extent, validity, and priority of liens held by Defendant and the producers, including Plaintiff, the Bankruptcy Court entered its Procedures Order on November 4, 2016. Def.'s App., Ex. A, at 4-5. Among other things, the Procedures Order prevented Plaintiff from filing a state court lawsuit against Defendant. Pl.'s Br. 18 ¶ 71. In accordance with the Procedures Order, Murphy filed the Adversary Complaint for Declaratory Judgment and Related Relief against Defendant and the producers, including Plaintiff. Def.'s App., Ex. A, at 5. The parties to the adversary proceeding were then realigned so that the producers were the plaintiffs and Murphy and Defendant were the defendants. *Id.* at 6.

On January 23, 2017, Plaintiff filed its Answer to Adversary Complaint for Declaratory Judgment and Related Relief, Counterclaim and Crossclaim. Def.'s App., Ex. N, at 203-16. In this filing, Plaintiff requested a declaratory judgment that it had a superior first priority lien in the Hydrocarbons and all proceeds therefrom as against Defendant. *Id.* at 211 ¶¶ 49-53. Plaintiff also sought equitable subordination of Defendant's claim due to Defendant's alleged intentional and willful misappropriation of the proceeds from the Hydrocarbons.[3] *Id.* at 213-14 ¶¶ 64-68.

The producers and Defendant separately moved for summary judgment in the bankruptcy case. The producers moved for summary judgment on certain counterclaims, and Defendant moved for summary judgment on the producers' counterclaims and crossclaims and on three

---

[3] "Equitable subordination allows the court to . . . rearrange the priorities of claims based upon the conduct of the creditors." *Herby's Foods, Inc. v. Summit Coffee Co.* (*In re Herby's Foods, Inc.*), 134 B.R. 207, 210-11 (Bankr. N.D. Tex. 1991) (citing *Pepper v. Litton*, 308 U.S. 295 (1939)).

declarations: (1) Defendant had a valid, first-priority lien on all property of Murphy's estate; (2) Defendant had a valid, first-priority lien on any proceeds from the sale of oil and gas in Murphy's account with Defendant; and (3) Defendant was not liable to the producers based on sweeps. Def.'s App., Ex. A, at 7-8, 15-18. The Bankruptcy Court issued a report and recommendation to the district court on March 28, 2019. *Id.* at 2-19. The Bankruptcy Court concluded that "any funds swept by [Defendant] were essentially returned to [Murphy] through re-advances without affecting the [p]roducers' lien rights." *Id.* at 15. Therefore, both parties' requests for declaratory judgments regarding lien priority were moot. *Id.* at 15, 18. As to Plaintiff's equitable subordination claim, the Bankruptcy Court recommended denying Defendant's motion for summary judgment. *Id.* at 17. The district court adopted the report and recommendation. Def.'s App., Ex. B, at 21-25.

Defendant subsequently filed a second summary judgment motion on Plaintiff's equitable subordination claim. Def.'s Br. 7 ¶ 31. The Bankruptcy Court held a hearing on that motion. Def.'s App., Ex. E, at 34-42. Following the hearing, the Bankruptcy Court granted Defendant's motion for summary judgment on the equitable subordination claim. Def.'s App., Ex. D, at 30-32. As no claims remained, the Bankruptcy Court entered its Final Judgment in the adversary proceeding on July 2, 2020. Def.'s App., Ex. F, at 44-46.

Plaintiff filed this lawsuit in Oklahoma state court on May 27, 2021. Notice of Removal [ECF No. 1] 9 ¶ 24. Defendant removed the case to the United States District Court for the Western District of Oklahoma. *Id.* at 1. On March 8, 2023, pursuant to a motion filed by Defendant, the Western District of Oklahoma transferred the case to this Court. *See* Order [ECF No. 46]. In its Amended Complaint, filed after transfer, Plaintiff brought claims for foreclosure of lien under the Oil and Gas Owners' Lien Act of 2010 ("Lien Act"), OKLA. STAT. tit. 52, § 549, declaratory

judgment pursuant to the Production Revenue Standards Act ("PRSA"), OKLA. STAT. tit. 12, § 570, negligence per se, intentional interference with contractual relations, conversion, fraud, constructive fraud, and unjust enrichment. Am. Compl. ¶¶ 43-93.

Defendant moved to dismiss all of Plaintiff's claims. *See* Mot. of Def. to Dismiss Pl.'s First Am. Compl. ("Motion to Dismiss") [ECF No. 81]. The Court issued a Memorandum Opinion and Order denying the Motion to Dismiss in large part. *See* Mem. Op. and Order ("Motion to Dismiss Opinion") [ECF No. 105]. However, the Court granted the motion with respect to Plaintiff's request for a declaratory judgment under the PRSA and constructive fraud claim. *Id.* at 7-10. Plaintiff did not amend its complaint after this ruling.[4] Defendant now moves for summary judgment on Plaintiff's remaining claims.

## II. LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, he "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof,

---

[4] Because the Court dismissed Plaintiff's request for a declaratory judgment under the PRSA and constructive fraud claim and Plaintiff did not amend or otherwise attempt to reassert those claims, the Court does not analyze them below.

the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) showing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322-25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[C]onclusory statements, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). The Court resolves factual controversies in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (citing *McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. ANALYSIS

Defendant seeks summary judgment on Plaintiff's claims in this case on four grounds: (1) res judicata; (2) collateral estoppel; (3) the preclusive effect of the DIP Order; and (4) the merits of the claims. Before turning to Defendant's arguments, however, the Court must determine which law applies to its various analyses. Concluding that federal law applies to the res judicata and collateral estoppel arguments and that Oklahoma law applies to the substantive merits of Plaintiff's claims, the Court proceeds to analyze each of Defendant's arguments in turn under the appropriate legal standards.

### A. Applicable Law

Plaintiff argues that the Court previously determined that "Oklahoma law governs the Court's analysis of Plaintiff's claims." Pl.'s Br. 22 ¶ 84. Therefore, according to Plaintiff, the Court

7

must also apply Oklahoma substantive law to Defendant's res judicata and collateral estoppel defenses. *Id.* at 22-23 ¶ 85.

Plaintiff is correct that the Court held that because there was no conflict between Oklahoma and Texas law as to the elements of Plaintiff's tort claims, the Court did not conduct a choice-of-law analysis and applied Oklahoma law. Mot. to Dismiss Op. 5-6. But the conclusion Plaintiff draws from this holding—that Oklahoma law also applies to the res judicata and collateral estoppel analyses—is incorrect. Because the prior judgments at issue in this case were rendered by federal courts, federal preclusion law applies. *See Ellis v. Amex Life Ins. Co.*, 211 F.3d 935, 937 (5th Cir. 2000) ("The preclusive effect of a prior federal court judgment is controlled by federal res judicata rules." (citation omitted)); *see also Higgins v. NMI Enters., Inc.*, No. 09-6594, 2014 WL 28858, at *8 (E.D. La. Jan. 2, 2014) ("[T]he potential preclusive effect of the bankruptcy proceeding is properly analyzed under federal law[.]"). Thus, the Court will refer to federal law when conducting the preclusion analysis and to Oklahoma law when considering the merits of Plaintiff's claims.

### B. Res Judicata

Defendant first seeks summary judgment on Plaintiff's claims on the basis of res judicata. Res judicata bars litigation of claims that were litigated or should have been raised in an earlier lawsuit. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005) (citation omitted). Res judicata has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions. *Id.* (citation omitted). According to Defendant, the res judicata effect of the summary judgment orders issued by the Bankruptcy Court and district court determines Plaintiff's claims here. Def.'s Br. 11-20 ¶¶ 49-74.

8

*i. First Summary Judgment*

The nature of a bankruptcy matter may impact the applicability of res judicata. Proceedings in bankruptcy court are either core or non-core. Core proceedings are those that "invoke[] a substantive right provided by title 11 [of the United States Code]" or "could arise only in the context of a bankruptcy proceeding." *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 189-90 (5th Cir. 1990) (citation omitted). Non-core proceedings are those that "do[] not invoke a substantive right created by the federal bankruptcy law" and "that could exist outside of bankruptcy." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987). Bankruptcy courts may hear non-core proceedings, but "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions." 28 U.S.C. § 157(c)(1).

The first summary judgment opinion covered non-core matters. Def.'s App., Ex. A, at 3. Under Fifth Circuit law, it is unsettled whether non-core proceedings can be given res judicata effect. *Compare Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 935 (5th Cir. 1999) ("[T]his court has held that claim preclusion applies only to core proceedings in bankruptcy[.]" (citing *Howell*, 897 F.2d at 189)), *with Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 741 n.10 (5th Cir. 1993) (indicating that Fifth Circuit precedent does not "hold that bankruptcy jurisdiction must always be core in order to be 'competent' for *res judicata* purposes"). In support of its argument that the Court should resolve this split in favor of applying res judicata, Defendant largely relies on non-Fifth Circuit cases. *See* Def.'s Br. 22-23 ¶ 81; Def.'s Notice of Suppl. Authority 1 ¶ 1. Because summary judgment is warranted on other grounds, the Court need not—and declines to—resolve this ambiguity in Fifth Circuit law. The Court will not give the first summary judgment opinion res judicata effect in this case.

*ii. Second Summary Judgment*

Defendant also seeks summary judgment on the ground that the second summary judgment order—predicated on equitable subordination—precludes Plaintiff's claims in this case. Equitable subordination is a core matter. *See* Def.'s App., Ex. D, at 31; Reply 12 ¶ 35 & n.34 (citing, among other sources, 11 U.S.C. § 510(c)); Def.'s App., Ex. N, at 208 ¶ 40 (excepting Plaintiff's equitable subordination claim from the list of non-core matters in the adversary proceeding); *see also, e.g.*, *Sibarium v. NCNB Tex. Nat'l Bank*, 107 B.R. 108, 115 (N.D. Tex. 1989) (stating that an equitable subordination cause of action "intimately involve[d] a core proceeding").

Applying the elements of res judicata here, the Court first notes that there is no dispute that the parties involved in this case were both parties to the bankruptcy proceeding. The summary judgment order disposing of the equitable subordination claim was rendered by a court of competent jurisdiction, i.e., the bankruptcy court presiding over a core proceeding. *See* 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . ."). And a grant of summary judgment constitutes a final judgment on the merits. *See Davis v. Wells Fargo Bank NA*, No. 4:14-CV-254-O, 2015 WL 11120587, at *2 (N.D. Tex. Jan. 15, 2015) (citing, among other sources, *Blanco River, LLC v. Green*, 457 F. App'x 431, 437 (5th Cir. 2012)). Moreover, the summary judgment decision was followed by the Final Judgment, which encompassed the summary judgment ruling. Def.'s App., Ex. F, at 44-46.

But the fourth element of res judicata—whether the same claim or cause of action was involved in both the equitable subordination proceeding and this case—presents a closer call. "[T]o determine whether both suits involve the same cause of action, [the Fifth Circuit] uses the transactional test." *Test Masters*, 428 F.3d at 571 (citation omitted). Under this test, a prior

10

judgment's preclusive effect extends to "all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.* (citation omitted). But "[e]ven if the two actions are the same under the transactional test, res judicata does not bar the [subsequent] action unless the [plaintiff] could and should have brought [its] claims in the former proceedings." *Howe v. Vaughan* (*In re Howe*), 913 F.2d 1138, 1145 (5th Cir. 1990) (citation omitted); *see also D-1 Enters., Inc. v. Com. State Bank*, 864 F.2d 36, 38 (5th Cir. 1989) ("Essential to the application of the doctrine of *res judicata* is the principle that the previously unlitigated claim to be precluded could and should have been brought in the earlier litigation." (citation omitted)).

In its summary judgment briefing, Defendant does not adequately address whether Plaintiff could and should have brought its Oklahoma state law claims in the equitable subordination proceeding. And it is unclear to the Court whether doing so would have been possible for two reasons. First, the Procedures Order limited the scope of the adversary proceeding. *See* Def.'s App., Ex. A, at 5 (ordering that the action "will be limited to declaratory relief on" certain threshold questions "but shall not seek payment or damages . . . and shall not determine the particular claims of any individual [s]eller"). Second, the nature of an equitable subordination proceeding is markedly different from a case like the one currently before the Court. *See Howell*, 897 F.2d at 189 ("[T]he remedy sought here and the theory upon which liability is premised are different from what could have been asserted through a request for equitable subordination in the bankruptcy court."); *In re Video Cassette Games, Inc.*, 108 B.R. 347, 351 (Bankr. N.D. Ga. 1989) (finding state tort and contract claims and equitable subordination claim "fundamentally different" because one focused on monetary relief while the other sought prioritization of claims based on bankruptcy law).

Since the fourth required element of res judicata is at best murky at this case, and because the Court determines that summary judgment is warranted on other grounds, the Court denies the Motion to the extent that it seeks summary judgment on Plaintiff's claims on the basis of res judicata.

### C. Collateral Estoppel

Next, Defendant seeks summary judgment on the basis of collateral estoppel. "Collateral estoppel precludes a party from litigating an issue already raised in an earlier action between the same parties" if certain conditions are met. *Test Masters*, 428 F.3d at 572 (citation omitted). Collateral estoppel requires that: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) determining the issue in the prior action was a necessary part of the judgment in that action. *Id.* (citation omitted). Collateral estoppel does not apply unless "both the facts and the legal standard used to assess them are the same in both proceedings."[5] *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (citation omitted). Unlike res judicata, collateral estoppel does not require a final adjudication on the merits. *T.B. b/n/f Bell v. Nw. Indep. Sch. Dist.*, No. 4:21-CV-00729-BP, 2022 WL 221226, at *5 (N.D. Tex. Jan. 25, 2022) (citing *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 396 (5th Cir. 2004)). And the concerns about whether non-core proceedings can have res judicata effect do not extend to collateral estoppel. *See Copeland*, 47 F.3d at 1422 ("Both *Howell* and *Latham* are distinguishable as involving res judicata (or claim preclusion) rather than collateral estoppel (or issue preclusion).").

---

[5] Plaintiff emphasizes that bankruptcy cases have "a restricted framework and special statutory procedures" in arguing against the application of preclusion doctrines. Pl.'s Br. 27 ¶ 95. But the Bankruptcy Court in the prior proceeding applied the same summary judgment standard that the Court applies here to assess the relevant facts. *See* Def.'s App., Ex. A, at 8. Thus, the Court disregards Plaintiff's opposition based on the nature of bankruptcy proceedings.

*i. First Summary Judgment*

The Court initially focuses on the issues resolved in connection with the first summary judgment ruling. The relevant issues involved in that ruling and the instant case are identical. First, an issue in the bankruptcy proceeding was whether Plaintiff's lien attached to readvances Defendant made to Murphy. *See* Def.'s App., Ex. A, at 9; *see also id.* at 10 ("The legal question before the Court is whether the [p]roducers' liens, to the extent they attached to the funds in the Deposit Account, attached to the funds re-advanced to [Murphy]."). The same issue has reappeared in this case. *See, e.g.*, Def.'s Br. 1 ¶ 3 ("[T]he replenishment of like funds *preserves*, rather than impairs, any creditor's interest in funds swept from a deposit account." (citation omitted)); Pl.'s Br. 47 ¶ 143 ("[Defendant] intentionally swept the Proceeds (impressed with the Lien Act lien) . . . and refused to return them."). Second, an issue in the bankruptcy proceeding was whether Defendant's readvances to Murphy exceeded the amount of swept funds, meaning that Defendant returned all swept funds to Murphy. *See* Def.'s App., Ex. A, at 9, 15. In this case, again, a central issue is whether the proceeds to which Plaintiff's lien attached were retained by Defendant or readvanced to Murphy. *See, e.g.*, Am. Compl. ¶¶ 37, 51, 59, 75; Pl.'s Br. 8 ¶ 23.

Plaintiff argues that collateral estoppel does not apply because Plaintiff "asserts different, state-law-based, causes of action from those heard by the bankruptcy court" and "asserts causes of action the bankruptcy court expressly declined to hear." Pl.'s Br. 28-29 ¶ 97. But only the issues, not the claims, must be identical. Collateral estoppel bars the relitigation of a fact issue "whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) (citation omitted).

The second requirement, that the issue was "actually litigated," mandates that "the issue is raised, contested by the parties, submitted for determination by the court, and determined."

*Raspanti v. Keaty* (*In re Keaty*), 397 F.3d 264, 272 (5th Cir. 2005) (citation omitted). The Court concludes that the issue of whether Plaintiff's lien attached to readvances was actually litigated in the prior proceeding. *See* Def.'s App., Ex. A, at 10-14 (explaining and analyzing the issue, detailing the producers' arguments on it, and resolving it). However, whether the issue of Defendant's readvances exceeding its sweeps was actually litigated is a closer call. Plaintiff and the other producers "did not attempt to dispute this assertion." *Id.* at 10; *see also id.* at 14 (referencing "the uncontested fact that [Defendant's] re-advances to [Murphy] during the relevant timeframe exceeded the amount of swept funds attributable to sales of Hydrocarbons"). Thus, the Court must determine what "contested by the parties" means.

The Fifth Circuit has cited the Restatement of Judgments, which states that an issue is actually litigated when it is "properly raised . . . and is submitted for determination, and is determined." *In re Keaty*, 397 F.3d at 271 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. D (1982)). Further, the Fifth Circuit and district courts within the circuit have determined that an issue is actually litigated if a party had the opportunity to contest it, even if it did not do so. *See Spence v. City of Dallas*, No. 3:04-CV-1387-B, 2006 WL 8437533, at *5 (N.D. Tex. Nov. 1, 2006) (collecting cases); *Stanley Tools v. Madison Mills, Inc.*, 109 F. Supp. 2d 500, 502 (E.D. La. 2000) ("[T]o satisfy the 'actually litigated' requirement, the issue need only be presented to the adverse party with the full opportunity and motive for the adverse party to contest it." (citation omitted)).

Here, Plaintiff and the other producers had the opportunity and motive to contest whether the readvances exceeded the sweeps. Defendant made that assertion in its summary judgment briefing in the bankruptcy proceeding and supported it with summary judgment evidence. *See* Def.'s App., Ex. A, at 10 & n.12. "The [p]roducers did not attempt to dispute this assertion." *Id.* at 10. As such, the Court concludes that the issue was actually litigated.

Finally, determining these issues was necessary to the judgment in the prior action. *See id.* at 14 ("[T]he majority of the relief requested in this [a]dversary [p]roceeding can be resolved based on (1) the Court's legal conclusion that to the extent the [p]roducers had valid liens on the funds in the Deposit Account, those liens attached to the funds re-advanced to [Murphy], [and] (2) the uncontested fact that [Defendant's] re-advances to [Murphy] during the relevant timeframe exceeded the amount of swept funds attributable to sales of Hydrocarbons[.]"); *see also id.* at 15-16, 18 (resolving some of the producers' and Defendant's claims based on the finding that Defendant returned swept funds to Murphy through readvances without affecting the producers' lien rights).

Therefore, the Court concludes that Plaintiff is barred from relitigating two issues: (1) whether its lien attached to funds readvanced to Murphy; and (2) whether Defendant readvanced funds in an amount exceeding what it swept. In other words, the Bankruptcy Court's finding that "any funds swept by [Defendant] were essentially returned to [Murphy] through re-advances without affecting the [p]roducers' lien rights" is entitled to preclusive effect. *Id.* at 15. The Court will explore the impact of this preclusive effect on Plaintiff's individual claims below.

*ii. Second Summary Judgment*

The Court turns next to the issues resolved in connection with the second summary judgment ruling. Defendant contends that, in the equitable subordination summary judgment ruling, the Bankruptcy Court determined that Defendant "did not engage in fraud, breach of fiduciary duties, [or] inequitable conduct, or use [Murphy] as an instrumentality or alter ego." Def.'s Br. 27 ¶ 99.

The Court cannot determine whether the facts underlying the equitable subordination ruling were identical to the relevant facts here. The Bankruptcy Court granted Defendant summary

15

judgment on the equitable subordination claim after Plaintiff and the other producers raised a "jurisdictional argument" as the sole basis for their objections to summary judgment. Def.'s App., Ex. E, at 40-41 at 7:24-8:5. The Bankruptcy Court stated that there were no genuine issues of material fact with respect to the equitable subordination claim; however, the court did not clarify what material facts it was considering. *Id.* at 41 at 8:1-5. Without this information, the Court cannot determine which, if any, issues are precluded by the equitable subordination ruling. For example, the ruling may not impact Plaintiff's fraud claim because "actual fraud need not be shown for equitable subordination." *Mach. Rental, Inc. v. Herpel* (*In re Multiponics, Inc.*), 622 F.2d 709, 720 (5th Cir. 1980) (citation omitted). Because the Court cannot determine which issues were actually litigated and necessary to the judgment in the equitable subordination matter, the Court cannot give any issues preclusive effect here.

### D. DIP Order

Defendant next argues that the DIP Order bars Plaintiff's claims because it released Defendant from any claims by Murphy's creditors related to the Credit Agreement. Def.'s Br. 28-30 ¶¶ 100-02. However, the DIP Order only "released, waived, and barred" such claims "for all purposes in these Cases and any Successor Cases." Def.'s App., Ex. G, at 73 § 12(b). "Cases," in turn, appears to refer to the Chapter 11 bankruptcy cases filed by Murphy. *See id.* at 50 § A. And "Successor Cases" means "any successor cases under the Bankruptcy Code." *Id.* at 64 § 7. Defendant does not explain how such a release could foreclose claims brought in a separate, non-bankruptcy proceeding. As such, the Court agrees with Plaintiff that the DIP Order has no impact on Defendant's liability in this case. *See* Pl.'s Br. 38 ¶ 115.

### E. Merits

Finally, Defendant contends that Plaintiff has not established that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor on its claims for violation of the Lien Act, negligence per se, intentional interference with contractual relations, conversion, fraud, and unjust enrichment. With respect to the Lien Act, conversion, and unjust enrichment claims, the Court additionally analyzes whether its collateral estoppel determination bars Plaintiff from asserting such claims.[6]

### i. Lien Act

The Lien Act "give[s] Oklahoma producers . . . a first-priority lien to secure payment for their interest in oil and gas sold to a first purchaser." *Gaskins v. Texon, LP*, 321 P.3d 985, 990 (Okla. Civ. App. 2013). Specifically, the Act provides: "To secure the obligations of a first purchaser to pay the sales price, and to secure the obligation of any person to pay any proceeds . . . each interest owner is hereby granted an oil and gas lien to the extent of the interest owner's interest in oil and gas rights." OKLA. STAT. tit. 52, § 549.3(A). The lien "[c]ontinues uninterrupted and without lapse in and to all proceeds." *Id.* § 549.3(B)(3). "Except for a permitted lien," this lien "takes priority over any other lien." *Id.* § 549.7. Plaintiff seeks to foreclose its lien against Defendant, contending that the lien attached to the Hydrocarbons it sold to Murphy and then remained attached to the proceeds in Murphy's account with Defendant. Pl.'s Br. 41-42 ¶¶ 124, 127; Am. Compl. ¶¶ 47-51.

The critical flaw in Plaintiff's argument is that it fails to account for readvances and thus does not create a fact dispute regarding whether the proceeds are in Defendant's possession such that Plaintiff can seek relief from Defendant. The summary judgment evidence establishes that

---

[6] Because the Court resolves the remaining claims on grounds unrelated to the prior rulings that the Court found are entitled to preclusive effect, the Court does not consider whether they are collaterally estopped.

Defendant did not retain the proceeds to which Plaintiff's lien attached; instead, Defendant readvanced the proceeds to Murphy. *See* Def.'s App., Ex. H, at 121 ¶ 5 ("All proceeds from Murphy's account receivables were deposited into the Deposit Account and swept by [Defendant] daily to pay down the revolver. Murphy would then receive new advances under the revolver[.]"); *see also* Pl.'s App., Ex. K [ECF No. 120-3] 629 ¶ 10 ("The Deposit Account was swept daily by [Defendant] . . . . To the extent that Murphy had availability on the [r]evolver, [Defendant] would then re-advance funds to Murphy."). Defendant advanced approximately $45,000,000 to Murphy between June and September 2016. Def.'s App., Ex. W, at 462-65. This amount far exceeds the proceeds resulting from Plaintiff's sales to Murphy. *See* Pl.'s Br. 9 ¶ 29 (contending that in June, July, and August 2016, Plaintiff sold Murphy crude resulting in "gross proceeds of $2,586,956.86" (citing Pl.'s App., Ex. E, at 310 ¶ 6)). Therefore, the evidence shows that the proceeds to which Plaintiff's lien attached were readvanced to Murphy and were not retained by Defendant.

Despite this evidence, Plaintiff claims that as of the date Murphy filed for bankruptcy, all proceeds received by Murphy for the sale of Hydrocarbons that Murphy purchased from producers, such as Plaintiff, "had been swept by [Defendant] and applied to [Defendant's] line of credit, and were not in Murphy's possession." Pl.'s Br. 8 ¶ 23. Plaintiff does not cite to any evidence to support this proposition. Similarly, Plaintiff argues that Defendant "intentionally swept the [p]roceeds" and "refused to return them." *Id.* at 15 ¶ 56. But once again, none of Plaintiff's cited evidence backs up this claim. Instead, it either lends further credence to the notion that Defendant readvanced swept funds, *see* Def.'s App, Ex. H, at 121 ¶ 5, or is vague as to which entity currently possesses the proceeds, *see* Pl.'s App., Ex. D, at 153-54 ¶ 3 (stating only that Plaintiff has not yet received the proceeds from its sales to Murphy).

Plaintiff relies heavily on its expert report to establish that the proceeds can be traced from the point of sale to Murphy and then into the deposit account, where they were "improperly taken by [Defendant]." Pl.'s Br. 14 ¶ 50. Plaintiff's expert report suffers from the same deficiencies as the rest of Plaintiff's argument and evidence. Plaintiff's expert considers only Defendant's sweeps of funds and ignores the readvances to Murphy that the expert acknowledges occurred virtually automatically until at least late July 2016. *See, e.g.*, Pl.'s App., Ex. K, at 646 ¶ 55 (stating that Defendant would readvance funds so long as there was availability under the revolver), 654 ¶ 82 (addressing sweep but failing to analyze whether funds were readvanced), 655-56 ¶ 88 (same).

Even if the Court ignored the summary judgment evidence in this case, Plaintiff is collaterally estopped from relitigating the Bankruptcy Court's determinations that its lien attached to Defendant's readvances to Murphy and that Defendant readvanced more than it swept. *See supra* § III.C.i. With these critical issues determined, Plaintiff cannot maintain a claim for foreclosure of lien against Defendant.

Because Plaintiff has not put forth evidence to create a genuine issue of material fact on the question of whether the proceeds impressed with Plaintiff's lien are in Defendant's possession, and because Plaintiff is estopped from making such an assertion, Plaintiff cannot foreclose on its lien against Defendant. Defendant is entitled to summary judgment on Plaintiff's claim under the Lien Act.

### ii. Negligence Per Se

Defendant next seeks summary judgment on Plaintiff's negligence per se claim. "The violation of an ordinance is deemed to be negligence per se" if: (1) the injury at issue was caused by such violation; (2) the injury was of the type the ordinance was intended to prevent; and (3) the injured party belonged to the class the ordinance was meant to protect. *Boyles v. Okla. Nat. Gas*

19

*Co.*, 619 P.2d 613, 618 (Okla. 1980) (citations omitted). "The statute involved in [Plaintiff's] negligence *per se* claim is the Lien Act."[7] Pl.'s Br. 44 ¶ 132. Thus, because the Court has determined that Defendant is entitled to summary judgment as to its liability under the Lien Act, Plaintiff cannot establish the requisite statutory violation. The Court grants the Motion with respect to Plaintiff's negligence per se claim.

### iii. Intentional Interference with Contractual Relations

Defendant contests Plaintiff's ability to establish the elements of a claim for intentional interference with contractual relations. To prove such a claim, Plaintiff must show that: (1) Defendant interfered with an existing contractual or business right; (2) the interference was malicious and wrongful; (3) the interference was not justified, privileged, or excusable; and (4) the interference proximately caused damage. *Loven v. Church Mut. Ins. Co.*, 452 P.3d 418, 423 n.12 (Okla. 2019) (citations omitted). Plaintiff sets forth the following facts in support of its claim: (1) Defendant knew Plaintiff had crude oil purchase contracts with Murphy; (2) Defendant interfered with such contracts "[b]y allowing Murphy to purchase and take possession of Hydrocarbons, and not allowing Murphy to pay [Plaintiff] for these Hydrocarbons"; and (3) such interference was malicious and wrongful because Defendant knew its rights in the proceeds were inferior to Plaintiff's rights. Am. Compl. ¶¶ 67-70; Pl.'s Br. 45-46 ¶¶ 137-38.

Plaintiff's claim fails because it has not demonstrated that Defendant interfered with Plaintiff's contracts with Murphy. First, there is no evidence that Defendant "allowed" Murphy to purchase the Hydrocarbons. All of Plaintiff's evidence goes only to the question of whether Defendant controlled Murphy's ability to pay for its purchases after they were made.

---

[7] Plaintiff also pleaded a violation of the PRSA to support its negligence per se claim. *See* Am. Compl. ¶ 61. The Court previously dismissed Plaintiff's PRSA claim; therefore, Plaintiff has not established a violation of the PRSA that could support a negligence per se claim. *See* Mot. to Dismiss Op. 9.

Second, there is no evidence that Defendant refused to allow Murphy to pay for the Hydrocarbons. Instead, the evidence shows that Defendant approved advancing funds under the revolver, Pl.'s App., Ex. S, at 4218-19 at 42:25-43:2, and approved payment amounts requested by Murphy but not "what they were going to pay," *id.* at 4216-17 at 40:24-41:7; *see also* Pl.'s App., Ex. B [ECF No. 120-1] 105 at 170:2-4 (representative of Defendant testifying that Defendant was "not deciding who was getting paid and who wasn't"). Though Murphy "[p]robably" could not make payments if it did not receive an advance from Defendant, Pl.'s App., Ex. S, at 4219 at 43:3-7, Plaintiff has not demonstrated that Murphy failed to pay Plaintiff because Defendant did not approve advances or that Defendant somehow targeted Plaintiff for non-payment. All of Plaintiff's cited examples of payment approvals or purported plans not to pay Plaintiff are ambiguous and do not involve Plaintiff and/or Defendant. For example, Plaintiff relies heavily on certain cash flow forecasts stating: "Producer payments are a risk item; managing to minimum amounts." *Id.* at 4250. It is unclear what "managing to minimum amounts" means. Regardless, the document was prepared by CR3, not Defendant, and does not mention Plaintiff. *See id.* at 4249 (stating that the cash receipts and disbursements projection was prepared by CR3), 4219-20 at 43:23-44:25 (representative of Defendant testifying that Defendant did not produce the relevant report). Other documents suffer from similar deficiencies. *See, e.g.*, Pl.'s App., Ex. C [ECF No. 120-1] 140 at 72:21-25 (omitting List's response to a question about what "managing to minimum amounts" means); *id.* at 139 at 71:6-23 (stating that CR3 prepared a cash flow forecast including a note about managing producer payments to minimum amounts); Pl.'s App., Ex. S, at 4254-55 (listing August 2, 2016, payment requests Murphy submitted to Defendant, which do not include any requests to pay Plaintiff).

Finally, to the extent Plaintiff argues that CR3, rather than Defendant, controlled Murphy's ability to pay for the Hydrocarbons, Plaintiff has not adequately set forth a theory under which Defendant can be held liable for CR3's actions. *See infra* § III.E.v.

Because Plaintiff has no evidence creating a genuine issue of material fact on the question of whether Defendant interfered with Plaintiff's contract with Murphy, Plaintiff's intentional interference with contractual relations claim does not survive summary judgment.

### iv. Conversion

Defendant also asserts that it is entitled to summary judgment on Plaintiff's conversion claim. Conversion is "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 825 (Okla. 2016) (citation omitted). A plaintiff claiming conversion must show "that the property was taken or appropriated without the owner's consent." *Id.* (emphasis and citation omitted). Here, Plaintiff's conversion claim is based on the notion that Defendant swept the proceeds of the Hydrocarbons "and refused to return them." Pl.'s Br. 47 ¶ 143; *see also* Am. Compl. ¶ 75. For the reasons set forth above, Plaintiff has not adduced sufficient evidence that Defendant kept the proceeds, as opposed to readvancing them to Murphy. *See supra* § III.E.i. And again, Plaintiff is estopped from making such an argument because the Bankruptcy Court already determined that Defendant readvanced more than it swept and that the readvances did not impair Plaintiff's lien rights. *See supra* § III.C.i. Therefore, Defendant is entitled to summary judgment on Plaintiff's conversion claim.

### v. Fraud

Defendant also challenges Plaintiff's fraud claim, which requires proof of the following elements under Oklahoma law: (1) the defendant made a material representation; (2) the

representation was false; (3) the defendant knew when it made the representation that it was false; (4) the defendant made the representation with the intention that the plaintiff should act upon it; and (5) the plaintiff relied upon the representation to its detriment. *Silk v. Phillips Petroleum Co.*, 760 P.2d 174, 176-77 (Okla. 1988) (citation omitted).

Plaintiff's fraud claim is primarily based on representations and/or omissions made by non-parties. *See* Pl.'s Br. 47 ¶ 144 ("[Defendant], through its agent CR3, made material misrepresentations to [Plaintiff] . . . ."); *id.* at 48 ¶ 145 ("[Defendant] represented, via its agents Steven List, CR3, and Murphy, to [Plaintiff] that Murphy would pay [Plaintiff] for the Hydrocarbons . . . ."). Plaintiff also contends that Defendant "allowed Murphy to continue purchasing Hydrocarbons" while Defendant was "in control of Murphy through CR3 and Steven List" and "allowed Murphy to sell the Hydrocarbons . . . to raise money to fund Murphy's ongoing business." Am. Compl. ¶¶ 79-81; *see also* Pl.'s Br. 48 ¶ 145.

Thus, Plaintiff's fraud claim relies on the theory that CR3, List, and/or Murphy were acting as agents of or were otherwise controlled by Defendant.[8] However, Plaintiff does not address or analyze the legal requirements of an agency relationship. Under Oklahoma law, the "burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it." *Fid. & Deposit Co. of Md. v. Riess Fam., LLC*, No. 16-CV-270-GKF-FHM, 2018 WL 2088757, at *6 (N.D. Okla. May 4, 2018) (citation omitted). "The law does not presume an agency status is present." *Enter. Mgmt. Consultants, Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*,

---

[8] To the extent Plaintiff relies on a control theory other than agency, Plaintiff has not adequately briefed such a theory, and the Court declines to speculate as to what it might be. *See State Farm Life Ins. Co. v. Bryant*, No. 3:18-CV-1628-L, 2020 WL 2812866, at *6 (N.D. Tex. May 30, 2020) ("[I]t is not incumbent on the court to make legal arguments for the parties or address issues that have not been properly briefed."). Further, as set forth above, there is insufficient evidence that Defendant controlled Murphy's purchase of Hydrocarbons from Plaintiff or Murphy's decision not to pay Plaintiff. *See supra* § III.E.iii.

768 P.2d 359, 362 (Okla. 1988). But even if Plaintiff had adequately briefed the issue, it has offered no evidence to create a material factual dispute.

An agency relationship may be based on either actual or apparent authority. *Fid. & Deposit Co.*, 2018 WL 2088757, at *6. Actual authority requires the principal's consent to the agent that it is authorized to act on behalf of the principal and subject to the principal's control. *Id.* (quoting *Thornton v. Ford Motor Co.*, 297 P.3d 413, 419 (Okla. Civ. App. 2012)); *see also McGee v. Alexander*, 37 P.3d 800, 807 (Okla. 2001) ("An essential element of an agency relationship is that the principal has some degree of control over the conduct and activities of the agent." (citation omitted)). Apparent authority "results from a manifestation by the principal to a third person that another is his agent." *Fid. & Deposit Co.*, 2018 WL 2088757, at *7 (cleaned up).

Plaintiff has not pointed to any evidence that CR3 or List was Defendant's agent. As to actual authority, the evidence does not show that Defendant controlled CR3 or List. Instead, the evidence shows that Defendant proposed both CR3 and FTI to Murphy as options for advisory firms with expertise in Murphy's industry "should [Murphy] wish to consider them." Pl.'s App., Ex. S, at 4245. A representative of Defendant testified that Defendant did not select List to serve as Murphy's Chief Restructuring Officer. *Id.* at 4212 at 36:20-22. And even if the evidence supported Plaintiff's theory that Defendant forced Murphy to hire CR3, that would not prove that Defendant had the right to control List and CR3 or that CR3 was acting on Defendant's behalf. Finally, though CR3 and List communicated with Defendant, Plaintiff provides no legal authority equating communication with control. *See id.* at 4219 at 43:12-21; Def.'s App., Ex. V, at 430 ¶ 3. As to apparent authority, Plaintiff does not argue, and has not produced any evidence, that Defendant manifested to anyone that CR3 or List was acting as its agent.

Plaintiff also has not created a fact issue with respect to Murphy's status as an agent of Defendant. Plaintiff has pointed to no evidence that Defendant authorized Murphy to act on its behalf. The mere fact that Defendant retained the right to approve and disapprove advances under the loan revolver does not give rise to an agency relationship. *See, e.g.*, Pl.'s Br. 13 ¶ 47. And Defendant did not manifest to anyone that Murphy was acting as its agent.

For these reasons, Plaintiff has not established a basis on which Defendant can be held liable for alleged fraudulent misrepresentations or omissions by CR3, List, and/or Murphy. Therefore, Defendant is entitled to summary judgment on Plaintiff's fraud claim.

### vi. Unjust Enrichment

Finally, Defendant asserts that it is entitled to summary judgment on Plaintiff's unjust enrichment claim. Unjust enrichment allows for recovery "upon a showing that [the defendant] ha[s] money in [its] hands that, in equity and good conscience, [it] ought not be allowed to retain." *French Energy, Inc. v. Alexander*, 818 P.2d 1234, 1237 (Okla. 1991). Plaintiff claims that Defendant was unjustly enriched when it "took" the Hydrocarbon proceeds and either directly or "through its agent[] caused Murphy to not pay [Plaintiff] the [p]roceeds for Murphy's sale of the Hydrocarbons." Am. Compl. ¶ 91; *see also* Pl.'s Br. 49 ¶ 148 ("[Defendant] refused to approve payment to [Plaintiff] by Murphy."). The Court concludes that Defendant is entitled to summary judgment on this claim for three reasons.

First, Defendant does not have the proceeds in its hands. Instead, as both this Court and the Bankruptcy Court have determined, Defendant readvanced the swept proceeds to Murphy. *See supra* §§ III.C.i., E.i. As such, Defendant was not enriched—unjustly or otherwise—and Plaintiff cannot look to Defendant to recover the proceeds. Second, as the Court has already found, Plaintiff has not successfully established that CR3, List, or Murphy was acting as Defendant's agent. *See*

*supra* § III.E.v. Third, for the reasons set forth above, Plaintiff has not provided summary judgment evidence creating a fact issue as to whether Defendant refused to allow Murphy to pay Plaintiff. *See supra* § III.E.iii. Therefore, Plaintiff's unjust enrichment claim does not survive summary judgment.

*    *    *

In sum, viewing all evidence and drawing all reasonable inferences in the light most favorable to Plaintiff, the Court holds that Defendant is entitled to summary judgment on all of Plaintiff's claims because Defendant has successfully demonstrated that there is no genuine dispute as to any material fact in this case.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion of Defendant Bank of America, N.A., for Summary Judgment on Plaintiff's First Amended Complaint [ECF No. 112]. This case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

SIGNED September 24, 2025.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**